**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
          lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DILIP NAYAK, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>KLARNA GROUP PLC, SEBASTIAN SIEMIATKOWSKI, NICLAS NEGLÉN, MICHAEL J. MORITZ, ROGER W. FERGUSON JR., LISA KAAE, OMID R. KORDESTANI, ANDREW REED, SARAH SMITH, DEANA TONER, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., UBS SECURITIES LLC, SG AMERICAS SECURITIES, LLC, NORDEA BANK ABP, BNP PARIBAS SECURITIES CORP., KEEFE, BRUYETTE & WOODS, INC., ROTHSCHILD & CO US INC., WEDBUSH SECURITIES INC., NOMURA SECURITIES INTERNATIONAL, INC., WR SECURITIES LLC,<br><br>    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Plaintiff Dilip Nayak ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Klarna Group plc ("Klarna" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired Klarna securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Klarna's initial public offering (the "IPO" or "Offering") and suffered compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.      In September 2025, Defendants held the IPO, offering approximately 34,311,274 shares (5 million of which were sold by Klarna, and the rest by certain selling shareholders) to the investing public at $40.00 per share.

3.      By the commencement of this action, Klarna's shares trade below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

7.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Hesai securities in this District.

## **PARTIES**

8.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

9.      Defendant Klarna purports to be a "technology-driven payments company, with operations spanning multiple countries." Further, Klarna states that it "connect[s] consumers and merchants with comprehensive payment solutions and tailored advertising solutions[.] Our payment solutions provide consumers with more control and flexibility over their payments."

10.      The Company is incorporated under the laws of England and Wales. Based in Sweden, it maintains an office at 800 N High Street, Suite 04-121, Columbus, Ohio 43215.

11.      Klarna securities trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "KLAR."

12.     Defendant Sebastian Siemiatkowski ("Siemiatkowski") was the Company's Chief Executive Officer and Director at the time of the IPO and signed or authorized the signing of Klarna's Registration Statement. He co-founded Klarna.

13.     Defendant Niclas Neglén ("Neglén") was at the time of the IPO Klarna's Chief Financial Officer and signed or authorized the signing of the Company's Registration Statement.

14.     Defendant Michael J. Moritz ("Moritz") was at the time of the IPO the Chairperson of the Board of Directors.

15.     Defendant Roger W. Ferguson Jr. ("Ferguson") was a Director at the time of the IPO and signed or authorized the signing of Klarna's Registration Statement.

16.     Defendant Lisa Kaae ("Kaae") was at the time of the IPO a Director and signed or authorized the signing of Klarna's Registration Statement.

17.     Defendant Omid R. Kordestani ("Kordestani") was at the time of the IPO a Director and signed or authorized the signing of Klarna's Registration Statement.

18.     Defendant Andrew Reed ("Reed") was at the time of the IPO a Director and signed or authorized the signing of Klarna's Registration Statement.

19.     Defendant Sarah Smith ("Smith") was at the time of the IPO a Director and signed or authorized the signing of Klarna's Registration Statement.

20.     Defendant Deana Toner ("Toner") served as Klarna's authorized representative within the United States and signed or authorized the signing of Klarna's Registration Statement.

21.     The Defendants named in ¶¶ 12-20 are sometimes referred to herein as the "Individual Defendants."

22.     Each of the Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the

4

underwriters, planned and contributed to the IPO and Registration Statement, and promotions to meet with and present favorable information to potential Klarna investors, all motivated by their own and the Company's financial interests.

23.    Defendant Goldman Sachs & Co. L.L.C. ("Goldman Sachs") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Goldman Sachs' address is 200 West Street, New York, NY 10282-2198. Goldman Sachs acted as a joint book-running manager.

24.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. J.P. Morgan's address is 270 Park Avenue, New York, New York 10017. J.P. Morgan acted as a joint book-running manager,

25.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Morgan Stanley's address is 1585 Broadway, New York, New York 10036-8293. Morgan Stanley acted as a joint book-running manager.

26.    Defendant BofA Securities, Inc. ("BofA Securities") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendants BofA Securities' address is One Bryant Park, New York, New York 10036. BofA Securities acted as a bookrunner.

27.    Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Citigroup's address is 383 Greenwich Street Tower Building, New York, NY 10013. Citigroup acted as a bookrunner.

28.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Deutsche Bank's address is 1 Columbus Circle, New York, NY 10019. Deutsche Bank acted as a book runner.

29.     Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant UBS' address is 11 Madison Avenue, New York, NY 10010.

30.     Defendant SG Americas Securities, LLC ("Societe Generale") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Societe Generale's address is 245 Park Avenue, New York, NY 10167. Society Generale acted as a bookrunner.

31.     Defendant Nordea Bank Abp ("Nordea Bank") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Nordea Bank's domestic address is 1211 Avenue of the Americas, 23rd Floor, New York, NY 10036. Nordea Bank acted as a co-manager.

32.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant BNP Paribas' address is 787 Seventh Avenue, New York, NY 10019. BNP Paribas acted as a co-manager.

33.     Defendant Keefe, Bruyette & Woods, Inc. ("KBW") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant KBW's address is 787 7th Avenue, New York, NY 10019. Keefe acted as a co-manager.

34.    Defendant Rothschild & Co US Inc. ("Rothschild") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Rothschild's address is 1251 Avenue of the Americas New York, NY 10020. Rothschild acted as a co-manager.

35.    Defendant Wedbush Securities Inc. ("Wedbush") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Wedbush's address is 225 S. Lake Ave Penthouse, Attention: Compliance, Pasadena, California 91101. Wedbush acted as a co-manager for the offering.

36.    Defendant Nomura Securities International, Inc. ("Nomura") is an investment banking firm that acted as an underwriter for the IPO, helping to draft and disseminate the IPO documents. Defendant Nomura's address is Worldwide Plaza, 309 West 49th Street, New York, New York 10019. Nomura acted as a co-manager for the offering.

37.    The Defendants named in ¶¶ 23-36 are sometimes referred to herein as the as the "Underwriter Defendants."

38.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from Klarna, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)    The Underwriter Defendants also demanded and obtained an agreement from

Klarna and the Individual Defendants that Klarna would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted Klarna and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Klarna, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Klarna's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Klarna securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about Klarna would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Klarna's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Klarna's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered

thereby, including those to Plaintiff and the other members of the Class.

39.     Klarna, the Individual Defendants, and the Underwriter Defendants, are referred to collectively as "Defendants."

## BACKGROUND

40.     As stated above, Klarna is a payments company. Prior to the IPO, Klarna gained attention for the nature of its loans. For example, Klarna allows users to take loans to purchase small items including, famously, burritos.

41.      On March 25, 2025, Retail Technology Innovation Hub published an article entitled "Klarna's Sebastian Siemiatkowski defends '*burrito now, pay later' DoorDash deal* amid social media backlash."

42.     The article stated that Siemiatkowski had "taken to social media to defend his company's recent US deal with DoorDash after it received *criticism over the thought of hard up Americans taking months to pay off a $25 fast food delivery*."

43.     It stated that "[i]n the coming months, DoorDash customers in the US will be able to tap Klarna's service when purchasing groceries, retail, and DashPass Annual Plan - on DoorDash.com or through the venture's app. When they reach check-out, they'll see Klarna as an additional payment option, including the ability to pay in four equal interest free installments."

44.     As of the filing of this complaint, Klarna advertises that it allows borrowers to receive financing from "6-24 months with interest rates ranging from 0.00%-*35.99%* APR[.]"

## SUBSTANTIVE ALLEGATIONS

## Materially False and Misleading Statements

45.      On or about March 14, 2025, Klarna filed with the SEC a Registration Statement on Form F-1, which in combination with subsequent amendments on Form F-1/A (the

"Amended Registration Statement"), would be used for the IPO.

46.    On September 10, 2025, Klarna filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, Klarna sold 34,311,274 shares at $40.00 per share.

47.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

48.    The Prospectus contained the following risk disclosure:

***The Success of our business depends on our underwriting process and our ability to accurately price consumer credit risk.***

We believe that one of our core competitive advantages is our underwriting process, ***which is based on our access to proprietary data, including third-party data***. ***We provide Pay in Full, Pay Later and Fair Financing payment options to our consumers***. Pay in Full instantly settles purchases at the time of the transaction. Pay Later enables consumers to purchase goods or services at the time of the transaction and pay the full amount at a later date. ***Fair Financing allows consumers to pay for their purchase over a longer duration***. We have designed our short-term credit products to serve a wide range of consumers, ***including those with varying credit histories and borrowing needs***. Rather than targeting a specific credit segment, our underwriting processes aim to responsibly provide our credit products across a broad customer base. To that end, we provide a new, real-time underwriting decision for each transaction, leveraging our own records, including Klarna history and purchase behavior of our active Klarna customers. We also leverage merchant data, credit bureau reports and open banking data to understand the financial position of the consumer at that point in time. Our underwriting process is fully automated, making decisions in real time, and is designed to prevent potential fraud and abuse and to ensure compliance with applicable AML and CTF laws and regulations while assessing the consumer's creditworthiness against our own internal risk appetite.

***Numerous factors, many of which can be unexpected or beyond our control, can adversely affect a consumer's credit risk and therefore our exposure to it***. There may be risks that exist, or that develop in the future, including market risks, economic risks, including as a result of rising inflation or unemployment rates or changes in international trade policies, such as imposition of new, or changes to existing, tariffs, taxes and other restrictions on global trade, and other external events, that we have not

appropriately anticipated, identified or mitigated, such as risks from inadequate or failed processes, people or systems, natural disasters, and compliance, reputational or legal matters, both as they relate directly to us as well as that relate to third parties with whom we partner, contract or otherwise do business. We may update our risk model for a number of reasons, including as new information becomes available to us, or to reflect our corporate strategy and objectives. For example, in 2019, we strategically decided to expand our operating model into additional geographies, with a particular focus on the United States, and in the following three years expanded into 12 additional markets. *As part of that growth strategy, we recalibrated our risk model to reflect our higher risk appetite in those markets, which contributed to a rapid GMV growth and an increase in the number of consumers and merchants on our network but also led to higher credit losses*, particularly in those new markets, and net losses on a consolidated basis. In mid-2022, while continuing to enjoy rapid GMV growth, we decided to again adjust our underwriting process to reflect our strategic recalibration to more balanced growth and shift towards profitability. *Accordingly, we implemented a risk-based down payment strategy to reduce transaction risk, introduced more stringent debt limit thresholds and higher initial payments on higher-risk purchases, adopted a credit bureau-based derogatory remark policy as part of our underwriting standards and accelerated the placement of overdue accounts with debt collection agencies*. These changes, together with our improved underwriting capabilities as we scaled and matured our operations in the United States, led to a decrease in our net credit losses as a percentage of GMV in that market from approximately 3.6% in 2021 to approximately 1% in 2024, all while our GMV grew by approximately 15% over the same period.

There can be no assurance, however, that similar changes to our risk model and, by extension, our underwriting process, will similarly lead to outcomes that align with our expectations and objectives. *In addition, changes to our risk model may be ineffective and the performance of our risk model may decline*. If our risk model does not effectively and accurately predict the credit risk of potential loans facilitated through our network, greater than expected losses may result on such loans and, as a result, our business, results of operations, financial condition and future prospects could be adversely affected.

In addition, if the risk model we use contains errors or is otherwise ineffective, our reputation and relationships with customers, partners, including originating bank partners, and other funding sources could be harmed, we may be subject to liability and our ability to access our funding sources may be inhibited. Our ability to attract consumers to our network and to build trust in our network and products and solutions depends on effectively evaluating consumer credit profiles and likelihood of consumer default. If any of the credit risk or fraud models we use contain programming or other errors or are ineffective or the data provided by consumers or third parties is incorrect or stale, or if we are unable to obtain accurate data from consumers or third parties (such as credit reporting agencies), the loan pricing and approval process through our network could be negatively affected, resulting in mispriced or misclassified loans or incorrect approvals or denials of loans.

Additionally, if we make errors in the development, validation or implementation of any of the models or tools used to underwrite loans that we subsequently securitize or sell to investors, those investors may experience higher delinquencies and losses. We may also be subject to liability to those investors if we misrepresented the characteristics of the loans sold because of those errors. Consequently, errors in our models or tools or an inability to effectively forecast loss rates could inhibit our ability to enter into forward flow loan sale arrangements or securitization transactions, otherwise sell loans to investors or utilize our funding arrangements, which could adversely affect our business, results of operations, financial condition and future prospects.

49.    The statement in ¶ 48 was materially false and misleading at the time it was made because it materially understated the credit risks involved in lending to Klarna's clients, because it omitted that many of these individuals are not financially sophisticated or are experiencing financial hardship, including loans to consumers who are willing to take loans out (which substantial interest rates) for items including fast food delivery orders.

50.    The Prospectus additionally included the following risk disclosure:

*If loans facilitated through our network do not perform, or significantly underperform, we may incur credit losses.*

Our consumers can use a number of payment methods to purchase products and services through our network both online and offline. ***Our Pay Later and Fair Financing payment methods involve extending consumer credit.*** As of June 30, 2025, our consumer lending credit exposure amounted to $13.1 billion, with $10.0 billion in consumer receivables and $3.1 billion of consumer loan commitments.

***If the loans facilitated through our network do not perform as expected, we may be required to increase our provisions for credit losses, which would negatively impact our profitability and financial condition***. This risk varies depending on our different lending products. ***For example, Fair Financing loans are longer in duration than our other products and have higher take rates but also lead to higher provisions for credit losses***. In addition, our credit losses may also vary depending on the maturity of our credit underwriting in a given market. For example, in the past we experienced higher credit losses in new geographies in the first several years following our entry into such geography. As a result, if we decide to expand into new markets, our credit losses may similarly increase. In addition, there can be no assurance that our credit loss rates in the geographies in which we currently operate will not increase in the future. Any significant increase in credit losses or underperformance of our loans could erode the confidence in the soundness of our underwriting model and our business generally, potentially leading to increased borrowing costs or reduced access to capital, any of which could have an adverse effect on our business, results of operations, financial

condition and future prospects.

51.     The statement in ¶ 50 was materially false and misleading at the time it was made because it understated the potential for provisions for credit losses to be materially raised. The reason it materially understated the likelihood of this outcome was because Klarna largely depends on payments from consumers who are not financially sophisticated or are experiencing financial hardship, including consumers who are willing to pay substantial interest rates on fast food delivery items.

52.     The Prospectus included the following disclosure:

***Determining our allowance for credit losses requires many assumptions and complex analyses. If our estimates prove incorrect, we may incur net charge-offs in excess of our reserves, or we may be required to increase our provision for credit losses.***

In the process of determining our allowance for credit losses, we employ a range of assumptions and complex analyses that are inherently subject to uncertainties and contingencies, many of which are beyond our control. These estimations and judgments affect the reported amounts of assets, liabilities, revenues and expenses, as well as the disclosures of contingent assets and liabilities in our financial statements. Consequently, if our estimates prove incorrect, we may incur net charge-offs in excess of our reserves, or we may be required to increase our provision for credit losses, either of which could adversely affect our business, results of operations, financial condition and future prospects.

Our credit loss allowance estimation process considers a wide array of factors, including historical loan loss experience, current loan portfolio characteristics, observable data indicating the impact of current economic and market conditions on our consumers' ability to repay their loans and forecasts of future economic conditions. ***Changes in any of these factors could significantly impact the level of future credit losses and the necessary allowance for credit losses***.

***Moreover, our business model and operations subject us to various credit risks, including the risk of default or fraudulent consumers using our payment services for shopping***, as well as credit risks from defaulting merchants, partners and financial institutions with which we cooperate. We utilize a self-developed scoring model for credit assessments, which collects specific data and is adapted for each country in which we operate, considering local regulations, accessibility to credit checks and consumer behavior differences. However, there is a risk that estimates on which models for calculating future potential impairments and credit losses are based are inaccurate, which could lead to increased credit losses and impairments. This, in turn, would

adversely affect our financial position.

> ***The process of determining the allowance for credit losses is highly judgmental and subject to significant uncertainties. Future changes in economic conditions, consumer behavior or regulatory environment could necessitate adjustments to our allowance for credit losses.*** An increase in the allowance for credit losses would result in a corresponding increase in our provision for credit losses, negatively impacting our results of operations. Conversely, if our allowance for credit losses proves to be excessive, it may result in an unnecessary allocation of financial resources that could have been utilized more effectively elsewhere within our operations.

53.     The statement in ¶ 52 was materially false and misleading at the time it was made for the reasons stated in ¶ 51.

54.     Separately, in the Prospectus, Klarna affirmed its ability to responsibly extend credit as a result of its business practices, stating the following:

> Our high credit modeling and scoring performance allows us to responsibly extend credit to consumers with different credit scores ***while maintaining the quality of our loan portfolio***.

55.     The statement in ¶ 54 was materially false at the time it was made because, in reality, Klarna would have to raise its provision for credit losses shortly after the IPO because of concerns regarding customers being able to repay it on loans, including many consumers who are not financially sophisticated or were experiencing financial hardship.

56.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

57.     The statements referenced in ¶¶ 48, 50, 52 and 54 above were materially false and/or misleading because it misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results. Specifically, the Registration Statement contained false and/or misleading statements and/or failed to disclose that: (1) Defendants materially understated the risk that its loss reserves would materially go up

within a few months of the IPO, which they either knew of or should have known of given the risk profile of many individuals agreeing to Klarna's buy now, pay later ("BNPL") loans; and (2); as a result, Defendants' public statements were materially false and misleading at all relevant times and negligently prepared.

58.    On November 18, 2025, Bloomberg News published an article entitled "Klarna Revenue Surges Yet Longer Loans Trigger Provisions."

59.    The article stated that "[Klarna] reported record revenue that beat estimates for its third quarter, *while setting aside more provisions for credit losses*, in its first set of earnings since going public."

60.    The article stated that Klarna had "posted a net loss of $95 million, as the firm set aside more money for potentially souring loans. [Klarna] said provisions *represented 0.72% of gross merchandise volume, up from 0.44% a year ago*. Provisions for loan losses came in at $235 million, *above analyst estimates of $215.8 million*."

61.    On November 18, 2025, Barron's published an article entitled "Klarna Stock Tumbles After First Earnings Report. What Investors Should Know."

62.    The article preliminarily stated that Klarna's "'fair financing' offering has *proven popular with customers, and contributed to accelerating revenue in the quarter*. The installment loan product allows customers to break up the cost of larger purchases into several fixed monthly payments, *typically over a longer span than Klarna's interest-free options*."

63.    The article also noted that Klarna "faces ongoing scrutiny over customer loan defaults" and further stated that while "BNPL ["buy now, pay later"] companies have enjoyed a recent spike in popularity, the business model has been no stranger to criticism." This is because "[p]roviders like Klarna generate most of their revenue from merchant fees and interest, but also

make money from late fees. ***Much of the fault-finding has to do with the user base lenders target: typically younger people with lower financial security***."

64.    The article cited the Richmond Fed, which had earlier noted that BNPL customers "tend to have a riskier credit profile: ***They are typically younger and less-educated, with higher debt burdens and lower credit scores***."

65.    Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

66.    SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the Offering risky or speculative and that each risk factor adequately described the risk. Defendants' failure to disclose the already occurring significant problems underlying its base business, as well as the likely material effects it would have on the Company's share price, rendered the Registration Statement's many references to known risks that "if" occurring "may" or "could" adversely affect the Company as false and misleading.

67.    Since the IPO, and as a result of the disclosure of material adverse facts omitted from Klarna's Registration Statement, its share price has fallen substantially below its IPO price, damaging Plaintiff and Class members. As of December 22, 2025, Klarna stock closed at $31.31 per share, below the IPO price.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

68.    Plaintiff brings this action as a class action on behalf of all those who purchased Klarna securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

69.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Klarna or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

72.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     whether Defendants violated the federal securities laws;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violations of Section 11 of the Securities Act Against All Defendants

74.     Plaintiff incorporates all the foregoing by reference.

75.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

76.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

77.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

78.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

18

79.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

80.     Plaintiff acquired Klarna securities pursuant to the Registration Statement.

81.     At the time of their purchases of Klarna securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

82.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act Against All Defendants**

83.     Plaintiff incorporates all the foregoing by reference.

84.     By means of the defective Prospectus, Defendants promoted, solicited, and sold the Company's securities to Plaintiff and other members of the Class.

85.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Klarna securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

86.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Klarna securities.

87.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Klarna securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the securities. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their securities, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

88.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## <u>COUNT III</u>
## <u>Violations of Section 15 of the Securities Act Against the Individual Defendants</u>

89.     Plaintiff incorporates all the foregoing by reference.

90.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

91.      The Individual Defendants were controlling persons of Klarna by virtue of their positions as directors or senior officers of Klarna. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and

major shareholders of Klarna. The Company controlled the Individual Defendants and all of Klarna's employees.

92.     Klarna and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

93.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated:  December 22, 2025                    Respectfully submitted,

                                            /s/Phillip Kim

                                            **THE ROSEN LAW FIRM, P.A.**
                                            Phillip Kim, Esq.
                                            Laurence M. Rosen, Esq.
                                            275 Madison Ave., 40th Floor
                                            New York, NY 10016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: lrosen@rosenlegal.com
                                            Email: philkim@rosenlegal.com

                                            *Counsel for Plaintiff*